This opinion is a
precedent of the TTAB

Mailed: June 25, 2026

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Ralph's Famous Italian Ices Franchise Corp.*

_____

Serial No. 90302728

_____

David L. May, Alexis P. Grilli, and Maggie E. Horstman of Nixon Peabody LLP,
  for Ralph's Famous Italian Ices Franchise Corp.

Hai-Ly Lam, Trademark Examining Attorney, Law Office 119,
  Brett Golden, Managing Attorney.

_____

Before Lykos, Greenbaum, and Casagrande, Administrative Trademark Judges.

Opinion by Casagrande, Administrative Trademark Judge:

Ralph's Famous Italian Ices Franchise Corp. (Applicant) seeks registration on the Principal Register of the following proposed mark for the beverages and confections (frozen and otherwise) and restaurant services discussed below:



Applicant's current description of the proposed mark, as amended, reflects that the proposed mark is used as trade dress, and reads: "The mark consists of a

repeating pattern of alternating blue and white vertical stripes. The repeating pattern appears on a portion of the surface of the goods, on a portion of the packaging for the goods, on a portion of the building facades in which the services are offered, and on displays, marketing and advertising materials associated with the services" ("current description").[1] The colors blue and white are claimed as features of the proposed mark.

The application identifies the following goods and services:

> Shakes; frozen drinks, namely, milk shakes, in International Class 29;

> Frozen confections; Beverages made of coffee; Beverages with a coffee base; Coffee-based iced beverages; Frozen drinks, namely, Italian ices, non-alcoholic frappes; Italian ices, in International Class 30;

> Fruit drinks, in International Class 32;

> Alcoholic beverages, except beer; Hard seltzer, in International Class 33;

> Restaurant franchising, namely, offering business management assistance in the establishment and/or operation of restaurants; franchise services, namely, offering business management assistance in the establishment and operation of retail business establishments featuring Italian ice, ice cream, and frozen drinks, in International Class 35; and

> Restaurant services; restaurant services featuring Italian ice, ice cream, and frozen drinks; serving food and drinks, in International Class 43.[2]

---

[1]  *See* May 17, 2024, Request for Reconsideration, at TSDR 16 (proposing this description); Aug. 16, 2024, Denial of Reconsideration, at TSDR 5 (accepting this description). Please note that any citations to specific pages of prosecution filings will be to .pdf-format versions of the documents as downloaded from the USPTO's TSDR electronic trademark docketing system.

[2]  Application Serial No. 90302728 was filed on November 6, 2020, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use anywhere and

As presented to us for decision, the application stands refused on the following grounds:

> As to all identified classes of goods and services, the proposed mark fails to function as a trademark and service mark under Sections 1, 2, 3[3] & 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1053 & 1127, because it constitutes ornamental matter that is not inherently distinctive and Applicant has failed to prove its claim, which it made in the alternative, of acquired distinctiveness under Section 2(f), 15 U.S.C. § 1052(f);[4] and
>
> As to the Class 35 franchising services only, the specimens do not show use of the proposed mark in commerce in connection with the identified services, as required under Sections 1 and 45, 15 U.S.C. §§ 1051, 1127, and Trademark Rules 2.34(a)(1)(iv) & 2.56(a), 37 C.F.R. §§ 2.34(a)(1)(iv) & 2.56(a).[5]

Applicant's appeal also raises a question about the description of the proposed mark. During prosecution, Applicant had previously proposed amendments to the description in response to the Examining Attorney's objections to prior descriptions.[6] In the August 19, 2024, Denial of Reconsideration, the Examining Attorney accepted

---

first use in commerce since at least as early as 2004 for each class of goods and services. Applicant amended its original identification of goods and services in its September 2, 2021, Response to Nonfinal Office Action.

[3] Section 3 of the Trademark Act applies only to the services.

[4] By claiming acquired distinctiveness in the alternative, *see* Feb. 3, 2023, Request for Reconsideration, at TSDR 21, Applicant avoided an implicit concession that its proposed mark is not inherently distinctive. *See, e.g.*, *In re Thomas Nelson, Inc.*, No. 76681269, 2011 WL 481341, at *1 (TTAB 2011).

[5] *See* Dec. 5, 2024, Subsequent Final Office Action. We will note, however, that the Examining Attorney withdrew an initial refusal under Sections 1 and 45 of the Trademark Act that the proposed mark was a "swatch" drawing that sought registration of more than one mark. *See* May 30, 2024 Non-Final Office Action.

[6] *See* Sept. 2, 2021, Response to Office Action; Aug. 29, 2023, Response to Office Action; May 17, 2024, Request for Reconsideration.

Applicant's then-pending amendment to the description, resulting in the current description.[7] Later, however, after Applicant appealed but before it filed its brief, Applicant requested that the Board remand the application to the Examining Attorney to consider yet another amendment to the description and to submit additional evidence in connection with the failure-to-function refusal.[8] The Board found good cause and granted the remand,[9] but on remand the Examining Attorney rejected the proposed amendment.[10] In its appeal brief,[11] Applicant, despite the current description having been deemed acceptable by the Examining Attorney, contests the rejection of its latest attempt to amend the written description of the mark.

After the Examining Attorney filed a brief,[12] Applicant filed a reply.[13] The appeal is now ready for decision.

For the reasons set forth below, we:

(1) reverse the Class 35 franchising services specimen refusal;

(2) accept Applicant's proposed further amendment to the description of the proposed mark; but

---

[7]    *See* Aug. 19, 2024, Denial of Reconsideration, at TSDR 5.

[8]    *See* 7 TTABVUE. Please note that references to the briefs and appeal record cite to the Board's TTABVUE electronic docket system. The number preceding "TTABVUE" represents the docket number assigned to the cited filing in TTABVUE and any number immediately following "TTABVUE" identifies the specifically-cited page(s), if any.

[9]    *See* 8 TTABVUE.

[10]    *See* 9 TTABVUE.

[11]    *See* 11 TTABVUE.

[12]    *See* 13 TTABVUE.

[13]    *See* 14 TTABVUE.

(3) affirm the refusal to register the proposed mark as to all goods and services because (i) the evidence shows that it is ornamental matter that is not inherently distinctive and (ii) Applicant has failed to prove its alternative claim that it has acquired distinctiveness.

## ANALYSIS

### I. The Class 35 specimen refusal

We first address the Class 35 specimen refusal under Sections 1 and 45 of the Trademark Act because, if we agree with this partial refusal, we need not assess the distinctiveness of the proposed mark as to these services. The Class 35 services identified are:

> Restaurant franchising, namely, offering business management assistance in the establishment and/or operation of restaurants; franchise services, namely, offering business management assistance in the establishment and operation of retail business establishments featuring Italian ice, ice cream, and frozen drinks.

The term "service mark" means "any word, name, symbol, or device, or any combination thereof … used by a person … to identify and distinguish the services of one person … from the services of others and to indicate the source of the services …." Trademark Act Section 45, 15 U.S.C. § 1127. Under Section 45, a service mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." Our rule governing specimens provides: "A service mark specimen must show the mark as used in the sale of the services, including use in the performance or rendering of the services, or in the advertising of the services. The specimen must show a direct association between the mark and the services." Trademark Rule 2.56(b)(2), 37 C.F.R. § 2.56(b)(2); *see also In re WAY Media, Inc.*, No. 86325739, 2016 WL 3566131, at *1 (TTAB 2016).

"[I]n assessing the specimens, consideration must be given not only to the information provided by the specimen itself, but also to any explanations offered by Applicant clarifying the nature, content, or context of use of the specimen that are consistent with what the specimen itself shows." *In re Pitney Bowes, Inc.*, No. 86502157, 2018 WL 360241, at *3 (TTAB 2018) (citing *In re DSM Pharms., Inc.*, No. 78373640, 2008 WL 2385957, at *2 (TTAB 2008) ("In determining whether a specimen is acceptable evidence of service mark use, we may consider applicant's explanations as to how the specimen is used, along with any other available evidence in the record that shows how the mark is actually used.")).

Applicant argues that its second substitute specimens, submitted in its May 17, 2024, Request for Reconsideration, demonstrate use of the proposed mark "in the rendering of its Class 35 services to its franchisees."[14] The May 17, 2024, filing contained Applicant's averment that "The specimen(s) submitted consists of screenshots of the franchise portal login page and screenshot of order [page] from the Franchise portal."[15] These two screenshots[16] appear below:

---

[14] *See* 11 TTABVUE 23-24.

[15] *See* May 17, 2024, Request for Reconsideration, at TSDR 5. In the request for reconsideration, Applicant declared "The substitute … specimen(s) was/were in use in commerce at least as early as the filing date of the application." *See id.*

[16] The screenshots appear at *id.* at 31-32. Duplicates appear at *id.* at 49-50.



Serial No. 90302728



The second of these two screenshots is illegible except for the words "PURCHASE ORDER." There's something that might be the proposed mark in the upper left of this screenshot, but we're not sure because it's so small and blurry. Trademark Rule 2.56(c) requires that a specimen consisting of a "web page printout" be "clear and legible." So the second screenshot does not suffice because it is illegible.

The first screenshot is legible, so it is not disqualified at the threshold. Applicant explains that this screenshot consists of "the log in page … offered by Applicant to its franchisees for completing online ordering."[17] Applicant contends that, under our precedents, it has satisfied the specimen requirement for its Class 35 restaurant franchising services. We agree.

The services here are "Restaurant franchising, namely, offering business management assistance in the establishment and/or operation of restaurants; franchise services, namely, offering business management assistance in the establishment and operation of retail business establishments featuring Italian ice, ice cream, and frozen drinks." It is helpful to understand, both as a business and a legal matter, what restaurant franchising is. The "cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.* 141 F.3d 490, 497 (3d Cir. 1998) (citation omitted); *see also Howell v. Chick-Fil-A, Inc.*, Civ. No. 92-30188-RV, 1993 WL 603296, at *3 (N.D. Fla. Oct. 29, 1993) ("Chick-Fil-A tightly

---

[17] *See* 11 TTABVUE 23.

controls the product which is sold in the restaurants operated by their independent contractors. Local restaurants are required to purchase their food and seasonings only from sources approved by Chick-Fil-A. … Of course, the central concept of fast food merchandising is a unique, standard product which will be instantly recognized by the public. Consequently, fast food franchisors strictly regulate the selection and preparation of the food to be sold by their franchisees. Such control is essential ….") (citation omitted).[18] It follows then that "Restaurant franchising, namely, offering business management assistance in the establishment and/or operation of restaurants" would involve ensuring that the foods sold meet the franchise quality standards. Providing franchisees an online means to order approved food and other approved supplies is thus a key component of Applicant's services for its contractual partners, its franchisees.

With these legal parameters and understanding of the broader restaurant franchising services in mind, it becomes clear under our caselaw that the combination of Applicant's log-in portal screenshot and accompanying explanation of how the page relates to the identified restaurant franchising business management assistance services together are sufficient to show or demonstrate use of the mark on the specimen for the identified services.[19] For example, in *Pitney Bowes*, the services were

---

[18] Indeed, to constitute a valid trademark license of any sort, the licensor must exercise quality control. *See Visa, U.S.A., Inc. v. Birmingham Trust Nat. Bank*, 696 F.2d 1371, 1377 (Fed. Cir. 1982) ("The principal requirement … is that the licensing agreement provides for adequate control by the licensor over the quality of goods or services produced under the mark by a licensee....") (cleaned up; citation omitted).

[19] Here, Applicant accompanied its second substitute specimens with a declaration that averred that "[t]he specimen(s) submitted consists of screenshots of the franchise portal login

"mailing services" and the mailing kiosk depicted in the specimen (a screenshot) referred to mailing services provided by others. *See* 2018 WL 360241, at *1-2. Looking at the specimen by itself, we acknowledged that the examining attorney had "reasonably found the specimen unclear as to whether Applicant, rather than a third party, provides the services …." *Id.* at 4. But Pitney Bowes then submitted a declaration explaining:

> These kiosks are furnished by Applicant and are placed in different locations for use by consumers. Consumers use the kiosk to place postage on a letter or package, and then place that [letter or package] in the receptacle that is part of the kiosk system for Applicant to pick up the letter or package and place it in the mail stream for delivery.

*Id.* at *1. Looking at the specimen together with the explanation, we held that Pitney Bowes' "explanation of the specimen and how [it] provides the outsourced mailing services referenced on the specimen resolved the ambiguity, and the refusal should not have been maintained." *Id.* at *4. We thus found that "the original specimen demonstrates use of the mark in a manner that creates in the minds of potential consumers a direct association between the mark and at least some of the services in the class, and the explanation corroborates this in a manner that removes any doubt." *Id.*

To the same effect is our decision in *In re Metriplex, Inc.*, No. 73836597, 1992 WL 169149 (TTAB 1992), which Applicant cites.[20] In *Metriplex*, the specimen showed only

---

page and screenshot of order [page] from the Franchise portal." *See* May 17, 2024, Request for Reconsideration, at TSDR 5.

[20]    *See* 11 TTABVUE 23.

the mark itself as it appears on a computer screen with no other reference to the services. But the services were provided via a computer and, "[a]s applicant explained in its declaration, the specimens show the mark as it appears on a computer terminal in the course of applicant's rendering of the service." *Id.* at *2. We thus held that "[t]here is no question that purchasers and users of the service would recognize [the mark], as it appears on the computer screen specimens, as a mark identifying the [identified services]. Thus, the printouts constitute specimens of the mark as used in the sale of the services." *Id.*; *see also In re JobDiva, Inc.*, 843 F.3d 936, 940, 942 (Fed. Cir. 2016) (Board erroneously failed to consider JobDiva's CEO's testimony that JobDiva curated and aggregated resumés on job boards for subscribers to access via Job Diva's personnel placement software).

Citing, inter alia, *In re Universal Oil Prods. Co.*, 476 F.2d 653, 655 (CCPA 1973), the Examining Attorney argues that "[a] specimen must show the mark used in a way that would create in the minds of potential consumers a sufficient nexus or direct association between the mark and the services being offered." 13 TTABVUE 19. That is correct as a general statement of the law. *See, e.g.*, *JobDiva*, 843 F.3d at 941-42 ("The question is whether a user would associate the mark with 'personnel placement and recruitment' services performed by JobDiva, even if JobDiva's software performs each of the steps of the service. In other words, the question is whether the evidence of JobDiva's use of its marks sufficiently creates in the minds of purchasers an association between the marks and JobDiva's personnel placement and recruitment services.") (cleaned up; citation omitted).

But the Examining Attorney does not explain how this general legal principle supports the specimen refusal here. If, by this statement, the Examining Attorney means that the specimen itself—apart from any declaration or other document(s) submitted along with it[21]—must **by itself** refer to "franchise services, namely, business management assistance in the establishment and operation of retail business establishments featuring Italian ice, ice cream, and frozen drinks," we disagree that *Universal Oil* supports this argument. *Universal Oil* held that there must be "some direct association between the offer of **services** and the mark sought to be registered therefor" (emphasis in original). *Id.* at 655. The Court presumably emphasized the term "services" in that sentence because the problem in that case was that the brochure that the applicant offered as a specimen showed the marks PACOL and PENEX in connection with two different **chemical processes** offered by the applicant but, as the Court pointed out, "[n]owhere in this brochure, however, is there a reference to PACOL or PENEX services." *Id.* at 654. Because the specimen showed the marks being used in connection only with something other than the identified services, the Court affirmed the Board's determination that the specimen was insufficient. That is not the case here, as the combination of the log-in page for Applicant's order entry system, together with Applicant's explanatory declaration, shows use of the mark in connection with the rendering of Applicant's Class 35 "franchise services, namely, offering business management assistance in the establishment and operation of retail business establishments featuring Italian ice,

---

[21] A declaration or sworn statement is preferable, but it is not required in all circumstances.

ice cream, and frozen drinks." *See, e.g.*, *Pitney Bowes*, 2018 WL 360241, at *4; *Metriplex*, 1992 WL 169149, at *1.[22]

Here, the combination of the "Ralph's Order Entry System" log-in page, together with Applicant's declaration explaining the page, suffices to show the proposed mark as used in rendering a part of the identified services in Class 35. We therefore reverse the Class 35 specimen refusal.[23]

## II. Is the proposed mark inherently distinctive for the goods and services in each identified International Class?

We now turn to whether the proposed mark—a repeating pattern of alternating vertical blue and white stripes—is inherently distinctive or, instead, constitutes ornamental matter that is not inherently distinctive as to the identified goods and services.

### A. Two preliminary matters

Before we assess the evidence bearing on whether the proposed mark is inherently distinctive, there are two preliminary matters to address.

---

[22] We also think the Examining Attorney's statement that the specimen must "create in the minds of **potential** consumers a sufficient nexus or direct association between the mark and the services being offered" (emphasis added) could reflect an incomplete statement about specimen acceptability for services. Specimens for services may reflect, as this screenshot does, the mark as used in **rendering** the service to those who receive the services. *See* Trademark Rule 2.56(b)(2), 37 C.F.R. § 2.56(b)(2). The Examining Attorney's statement, however, could be read as limiting specimens to those used in selling or advertising the services.

[23] Because we reverse the Class 35 specimen refusal based on the second substitute specimens that Applicant submitted with its May 17, 2024, Request for Reconsideration, it is unnecessary to consider whether Applicant's original or first substitute specimens show service mark usage for Class 35.

### 1. The description of the proposed mark

We first need to address a dispute about the description of the mark.

"A description of the mark must be included if the mark is not in standard characters." Trademark Rule 2.37, 37 C.F.R. § 2.37; *see also* Trademark Rule 2.52(b)(5), 37 C.F.R. § 2.52(b)(5). Trademark Rule 2.52(b)(1) provides that for special form drawings, "[t]he applicant must include a clear drawing of the mark when the application is filed." In addition, for an application to register a mark that "includes color," "the drawing must show the mark in color, and the applicant must name the color(s) [and] describe where the color(s) appear on the mark … ." 37 C.F.R. § 2.52(b)(1). Section 808.02 of the TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) (May 2026) provides the following guidance: "the description should state clearly and accurately what the mark comprises, and should not create a misleading impression… ." Section 1202.19(b), which applies to marks comprising repeating patterns, adds that the description must be "accurate" and "identify the various elements of the pattern." "It is sufficient for the description to generally characterize the elements and indicate that they are repeated." *Id*. As with all types of marks, "[f]or repeating patterns featuring color, the application must include an appropriate color claim and the description must indicate where the claimed colors appear." *Id*.

And for repeating patterns used in connection with goods, "the description must specify how the pattern will appear on the relevant items;" and whether the pattern appears over the entire surface of the item or only a portion of the item itself or packaging. *Id*.

The description of a mark is especially important for marks comprising trade dress. In *In re Data Packaging Corp.*, 453 F.2d 1300 (CCPA 1972), the Court discussed the U.S. Supreme Court's decision in *Leschen & Sons Rope Co. v. Broderick & Bascom Rope Co.*, 201 U.S. 166 (1906), and explained why this is so. The *Data Packaging* decision described how, in *Leschen*, "the description of appellant's trademark contained in its registration" stated 'The trademark consists of a red **or other distinctly colored** streak **applied to or woven in** a wire rope.'" *Data Packaging*, 453 F.2d at 1303 (emphasis added). But the drawing of the mark in the application showed the "streak" to be red and woven "within the strands." *See id.* The *Data Packaging* Court noted that this discrepancy between the drawing and the written description of the mark led the U.S. Supreme Court to hold the registration invalid because a competitor "might, by adopting a **white** streak running along the length of the rope **across the strands**, find himself an infringer, when his real object may have been to obtain a mark which would distinguish his manufacture from that of the plaintiff's." *See id.* (emphasis added).

As we mentioned at the outset, the most recent description that the Examining Attorney found acceptable was:

> The mark consists of a repeating pattern of alternating blue and white vertical stripes. The repeating pattern appears on a portion of the surface of the goods, on a portion of the packaging for the goods, on a portion of the building facades in which the services are offered, and on displays, marketing and advertising materials associated with the services.[24]

---

[24]  *See* May 17, 2024, Request for Reconsideration at TSDR 2 (asking to amend description); *see also* August 19, 2024, Denial of Reconsideration, at TSDR 5 (accepting this description).

Following the institution of this appeal, Applicant filed a request to remand the application to the Examining Attorney for consideration of a proposed amendment to the description to read (additional language shown in **bold**):

> The mark consists of a repeating pattern of alternating blue and white vertical stripes**, which are of equal width and proportion**. The repeating pattern appears on a portion of the surface of the goods, on a portion of the packaging for the goods, on a portion of the building facades in which the services are offered, and on displays, marketing and advertising materials associated with the services.[25]

The Examining Attorney, however, denied Applicant's request to amend the description, stating:

> The additional language "which are of equal width and proportion" is unacceptable as being inaccurate because the alternating blue and white vertical stripes are NOT of "equal width and proportion". Here, the blue vertical stripes are thinner than the white vertical stripes. As such, the proposed mark description amendment is unacceptable.[26]

Applicant insists otherwise, hypothesizing that the Examining Attorney has fallen prey to an optical illusion whereby the human eye perceives the white lines as larger than the alternating and contrasting darker colored blue lines.[27] Neither the Examining Attorney's nor Applicant's position is accompanied by evidence (except, of course, the drawing itself). And both seem like reasonable positions. As such, we

---

We read that wording "appears on a portion of the surface of the goods" to include the cups and containers in which many of the goods—such as those identified in Classes 29, 30, and 32—are sold (for example, in restaurants and at ice cream/ices stands). *Cf.* TMEP Section 904.03(k) (discussing specimens for marks that are impracticable to place on goods).

[25]   *See* 7 TTABVUE 2 (Oct. 11, 2024, Request for Remand).

[26]   *See* 9 TTABVUE 2 (Dec. 5, 2024, Subsequent Final Office Action).

[27]   *See* 14 TTABVUE 21.

believe that this situation appropriately falls within the guidelines set forth in the Trademark Manual of Examining Procedure that "if an element in a mark could reasonably be characterized in more than one way, the examining attorney should accept the applicant's selection of one characterization over the other in the description." TMEP § 808.02. Accordingly, we accept the proposed amendment to the description of the mark that Applicant submitted on remand as accurate and as the operative description for purposes of this appeal.[28]

### 2.  Applicant's belated request for a conditional remand

In its reply brief, Applicant asserts that the URLs identifying a handful of Internet webpages the Examining Attorney placed in the record over the five-year period of Applicant's prosecution of this application are currently inoperative.[29] Applicant claims that this makes the screenshots depicted by these webpages "irrelevant."[30] Applicant attaches what it says are screenshots of the pages reflected by these now-nonworking links to its reply brief and requests that, if its appeal is "refused," the Board should remand the case to consider "this new evidence."[31] The request is denied.

There are many problems with this argument and conditional remand request. First, the record should be complete before appeal, Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d), so Applicant should not have attached "new evidence" to a brief to

---

[28]  The application continues to claim the colors blue and white as a feature of the mark.

[29]  *See* 14 TTABVUE 17-18.

[30]  *Id.*

[31]  *Id.* at 18.

the Board. Second, once a final decision issues on an appeal, prosecution will not be re-opened except to enter a disclaimer. Trademark Rule 2.142(g), 37 C.F.R. § 2.142(g). Third, we generally do not consider remand requests embedded in briefs; rather, they should be made by separate request, preferably before **any** briefs are filed. *See, e.g.*, *In re Ox Paperboard, LLC*, No. 87847482, 2020 WL 4530517, at *2 (TTAB 2020). Fourth, requests for remand should be accompanied by a showing of good cause, *see generally In re NextGen Mgmt., LLC*, No. 88098031, 2023 WL 111145, at *2 (TTAB 2020), and Applicant has not even attempted to show good cause for a remand at this final stage of the appeal. *See, e.g.*, *Ox Paperboard*, 2020 WL 4530517, at *3; *In re Thomas White Int'l, Ltd.*, No. 77080379, 2013 WL 2951787, at *6 (TTAB 2013); *In re Petroglyph Games, Inc.*, No. 78806413, 2009 WL 1759327, at *2 (TTAB 2009).

Fifth, we question the premise of this argument. That a URL for a specific webpage in the record no longer works does not mean that the product or service depicted on the page is not currently depicted on another webpage or that it never existed or no longer is available in the market. Companies frequently change the graphics, content, and specific pagination of their websites. Applicant provides no evidence that the products and services depicted were never, or are no longer, available. *Cf. In re Gen. Mills IP Holdings II, LLC*, No. 86757390, 2017 WL 4082590, at *6 (TTAB 2017) ("Applicant has not adduced evidence to support its contention that some of the products shown are no longer offered; the burden of rebutting the Examining Attorney's evidence rests on Applicant."). And even if the product or service depicted in a webpage appended to an Office action in an appeal record were

no longer available, that does not make it "irrelevant" in a case of this type. As the Federal Circuit said when assessing inherent distinctiveness in *Chippendales*, "the Board appropriately considered evidence of the current situation as well as evidence of earlier uses, since earlier uses can shed light on the current situation." 622 F.3d at 1355. We further note that there is no arbitrary time cut-off for evidence of third-party use in assessing acquired distinctiveness. While evidence of use older than five years old may be less probative than more recent evidence, *see, e.g., Converse, Inc. v. ITC*, 909 F.3d 1110, 1121 (Fed. Cir. 2018), none of the webpages about which Applicant complains were placed in the record more than five years ago.

Still, we give no further consideration to some of these allegedly nonworking webpages as well as other webpages for other reasons. Several pages are stock photo licensing images or awning company websites, and appear to be mock-ups rather than depictions of actual retail businesses in the fields with which we are concerned. We also give no further consideration to photos of several foreign ice cream shops that use stripes because there is no corresponding evidence indicating the extent, if any, to which U.S. consumers have been exposed to these foreign uses. *See In re Florists' Transworld Delivery, Inc.*, No. 77590475, 2013 WL 2951796, at *1 (TTAB 2013); *see generally In re Bayer AG*, 488 F.3d 960, 969 (Fed. Cir. 2007). As to the remaining handful of objected-to webpages, they represent only a minute fraction of the uses of stripes by others for the relevant goods and services in the record, so even if we were to exclude them, our findings below would not change in any material sense.

### B. Legal standards: Inherent distinctiveness and trade dress

As defined in the Trademark Act, a "trademark" or "service mark" includes "any word, name, symbol, or device … used by a person … to identify and distinguish" their goods or services from those of others and "to indicate the source" of the goods or services. 15 U.S.C. § 1127. To perform the function of a mark to "identify and distinguish" among sources of a good or service and thus be protectable, a proposed mark must be "distinctive." *See, e.g.*, *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015) ("The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others.") (citation omitted). "The general rule regarding distinctiveness has long been clear: An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness …." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (citations omitted); *see also Del. & Hudson Canal Co. v. Clark*, 80 U.S. 311, 323 (1871) ("The trade-mark must therefore be distinctive in its original signification, pointing to the origin of the article, or it must have become such by association.").

The standards for determining a proposed mark's inherent distinctiveness depend on what kind of mark is at issue. Here, we are concerned with what the current description characterizes as "a repeating pattern of alternating blue and white vertical stripes" of equal width that "appears on a portion of the surface of the goods, on a portion of the packaging for the goods, on a portion of the building facades in

which the services are offered, and on displays, marketing and advertising materials associated with the services." Thus, we are not concerned with a word mark.[32]

Rather, we are concerned here with trade dress. Product packaging trade dress may qualify as inherently distinctive, depending on the evidence.[33] *See, e.g., Two Pesos*, 505 U.S. at 773-74 (restaurant décor); *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1351 (Fed. Cir. 2010) (design of a costume worn by a service provider, i.e., "trade dress" constituting the "packaging" of the service). Whether such trade dress is inherently distinctive requires an assessment of:

[1] whether it was a 'common' basic shape or design,

[2] whether it was [not] unique or unusual in the particular field,

[3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods [or services] viewed by the public as a dress or ornamentation for the goods [or services], or

[4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Chippendales*, 622 F.3d at 1351 (quoting *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (CCPA 1977)). If the answer to **any** of the first three *Seabrook* inquiries as formulated in *Chippendales* is "yes," the design is **not** inherently

---

[32] If we were concerned with a word mark, we would evaluate inherent distinctiveness by determining whether the word(s) is arbitrary, fanciful, or suggestive, as applied to the goods or services (in which case it is inherently distinctive), or instead is merely descriptive or generic as to the goods or services (in which case it is not). *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000); *Two Pesos*, 505 U.S. at 768.

[33] In contrast, product design (i.e., the shape or configuration of a product or one or more components thereof)can constitute a type of trade dress if nonfunctional, *see* Trademark Act § 2(e)(5); *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 30 (2001), but can never be considered inherently distinctive. *See Wal-Mart*, 529 U.S. at 212, 216.

distinctive. *Id.*[34] In *In re Fantasia Distrib., Inc.*, No. 86185623, 2016 WL 5866950 (TTAB 2016), the Board adapted and applied this test to a design constituting a repeating ornamental pattern on goods. *See id.* at *2-3 ("To assess the potential inherent distinctiveness of a repeating pattern appearing on a product, such as the mark in this case, we follow *Seabrook Foods* …, adapting its factors to this context as appropriate ….").

*Fantasia* noted that marks constituting repeating patterns "frequently serve an ornamental function in various contexts to decorate goods, such that consumers would not be predisposed to equate the repeating patterns with source." *See id.* at *2. Taking a cue from the decision in *In re Soccer Sport Supply Co.*, 507 F.2d 1400 (CCPA 1975), the Board in *Fantasia* held that it did not "absolutely foreclose" the possibility that some proposed marks constituting repeating patterns could be inherently distinctive and "function as a mark." 2016 WL 5866950, at *2. As *Soccer Sport Supply* put it:

> An ornamental design can be inherently distinctive if it is arbitrary and distinctive and if its principal function is to identify and distinguish the source of the goods to which it is applied, ornamentation being merely incidental. However, a design which is a mere refinement of a commonly-adopted and well-known form of ornamentation for a class of goods would presumably be viewed by the public as a dress or ornamentation for the goods. Especially would this be so when such design is applied repetitively to the entire surface of the goods.

---

[34] Because no words accompany the stripes trade dress in this case, the fourth consideration is not implicated.

507 F.2d at 1402-03 (citations omitted). In light of the possibility that some repeating ornamental patterns could be inherently distinctive, the Board in *Fantasia* turned to the test adopted in *Seabrook Foods* (and later applied to services in *Chippendales*), adapting it to apply to proposed marks constituting repeating patterns and considering:

- the nature of Applicant's goods and whether there is an industry practice of ornamenting such goods;

- the nature of the pattern, including whether any element of the pattern might be perceived as source indicating if it were standing alone;

- how common the pattern is, whether it is composed of common or unusual repeating shapes, whether such shapes repeat in a common or unusual manner, and whether the overall pattern is similar to, or a mere refinement or variation of, a common and well-known form of ornamentation;

- the manner in which the repeating pattern appears on the product, including the size and location of the pattern on the product and how much of the product is covered by the pattern; and

- whether the pattern creates a distinct commercial impression apart from any accompanying wording and design elements.[35]

*Id.* at *3 (citations omitted).[36] The Board noted that, as with the originally-formulated "*Seabrook*" test, "[p]articular factors may be dispositive as to the lack of inherent distinctiveness, without the need for a showing under each factor." *Id.* (citing *Chippendales*, 622 F.3d at 1351).

Notably, although Applicant contests the Examining Attorney's finding that the mark is not inherently distinctive, neither Applicant's appeal brief nor its reply even

---

[35] This inquiry is not implicated here because no words or other design elements appear in the drawing of the proposed mark.

[36] Though *Fantasia* concerned goods, its analysis is easily applied to services.

mention—let alone purport to apply—the inherent distinctiveness tests set forth in *Chippendales* or *Fantasia*. Rather, its arguments as to the finding that the mark is not inherently distinctive refer to concepts relevant to acquired distinctiveness, such as Applicant's alleged "look-for" advertising,[37] articles discussing Applicant,[38] and Applicant's length of use, sales success, and marketing expenditures.[39] Nevertheless, we will assess how the evidence of record stacks up under the applicable legal test for inherent distinctiveness.

We assess inherent distinctiveness as to each class of goods or services in the application. That is because distinctiveness of proposed trademarks is examined in connection with the identified goods or services, not in the abstract. *See Bayer AG*, 488 F.3d at 963-64; *see also* 15 U.S.C. § 1052(e)(1) (registration must be refused if the proposed mark "[c]onsists of a mark which (1) **when used on or in connection with the goods of the applicant** is merely descriptive … of them") (emphasis added).[40]

### C. Assessment of the evidence

We will now turn to our assessment of the record evidence, proceeding class-by-class.

---

[37]  *See* 11 TTABVUE 11-12.

[38]  *See id.* at 12.

[39]  *See id.* at 13.

[40]  The same goes for acquired distinctiveness. *See* 15 U.S.C. § 1052(f) ("nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive **of the applicant's goods**") (emphasis added); *see also In re Automatic Radio Mfg. Co.*, 404 F.2d 1391, 1396 (CCPA 1969) (distinctiveness *vel non* must be determined "with respect to the involved goods … whether the issue be considered to be descriptiveness or 'secondary' meaning").

### 1. Shakes; frozen drinks, namely, milk shakes (Class 29)

We first assess the evidence relating to Applicant's identified goods in Class 26: shakes and milk shakes. We note that none of Applicant's specimens show the proposed trade dress on a cup or container for such shakes. Rather, Applicant's use of the proposed stripes pattern in connection with these goods appears to be as part of the décor of Applicant's retail locations.

The Examining Attorney placed in the record examples of several companies that use repeating stripe patterns in connection with selling shakes and milk shakes. Many, like Applicant, use blue & white stripes of approximately equal width:

- Bridgehampton Candy Kitchen Ice Cream Parlour & Eatery;[41]

- Uncle Louie G's;[42]

- Taggart's Ice Cream;[43]

- Ye Ole Fashioned Ice Cream & Sandwich Café;[44]

- Yum Yum Shop;[45]

- The Sundae Drive Ice Cream Shop;[46]

- Dreamette (wide blue stripes with narrow white stripes);[47]

- Sweet Experience;[48]

---

[41] Aug. 16, 2024, Denial of Reconsideration, at TSDR 14-16.

[42] *Id.* at 27-31.

[43] *Id.* at 32-33.

[44] *Id.* at 35-38.

[45] *Id.* at 39-40.

[46] *Id.* at 43-44.

[47] *Id.* at 50-55.

[48] *Id.* at 72-73.

- Dogg's Ice Cream (blue and white of varying widths);[49]

- Ben & Jerry's (Hyannis);[50] and

- Blue Mountain Beach Creamery & Shake Shop.[51]

Several others who sell shakes and milk shakes use vertical stripes of various other alternating colors:

- Son's Ice Cream & Italian Ice (white, medium blue and dark blue stripes);[52]

- Brooklyn Ice Cream Factory (grey & white on awning; blue & white on ice cream cone wrapper);[53]

- Handel's Ice Cream & Yogurt (blue & white with thin red stripe);[54]

- Portillo's (red & white);[55] and

- Kulfi's (brown & white).[56]

The evidence shows that, like Applicant, many other sellers of shakes and milk shakes feature alternating blue & white stripes on the external décor of the establishment where they sell their shakes. In other words, these stripes are a basic and common type of ornamentation used in connection with sales of these goods. *See, e.g., Chippendales*, 622 F.3d at 1351 (inquiries [1] & [2]); *Seabrook Foods*, 568 F.2d

---

[49]  *Id.* at 81-84.

[50]  November 17, 2023, Subsequent Final Office Action, at TSDR 61-62.

[51]  *Id.* at 65-76.

[52]  Aug.16, 2024, Denial of Reconsideration, at TSDR at 57-59.

[53]  *Id.* at 63-65.

[54]  *Id.* at 68-69.

[55]  Nov. 17, 2023, Subsequent Final Office Action, at TSDR 12-13.

[56]  May 30, 2023, Subsequent Nonfinal Office Action, at TSDR 82-88.

at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (first and third bulleted inquiries). Many other such shake vendors use vertical stripes of other alternating pairs of colors (or multiple colors). Applicant, like so many others, uses its ordinary and unremarkable stripes pattern in the customary way. At most, Applicant's blue & white stripes constitute a mere refinement or variation of the common practice of using alternating colored stripes in this field. *See, e.g., Chippendales*, 622 F.3d at 1351 (inquiry [3]); *Seabrook Foods*, 568 F.2d at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (third bulleted inquiry). As to these goods, the evidence overwhelmingly shows that the proposed mark is not inherently distinctive.

2. **Frozen confections; Beverages made of coffee; Beverages with a coffee base; Coffee-based iced beverages; Frozen drinks, namely, Italian ices, non-alcoholic frappes; Italian ices (Class 30)**

As to frozen confections, Italian ices, and frozen drinks, the Examining Attorney similarly placed in the record examples from the websites of several companies and other Internet sources displaying photos of vendors of these goods and their retail outlets that use repeating stripe patterns in connection with such goods. Many, like Applicant, use blue & white stripes of approximately equal width and proportion:

- Bridgehampton Candy Kitchen Ice Cream Parlour & Eatery;[57]

- Uncle Louie G's;[58]

- Taggart's Ice Cream;[59]

---

[57] Aug. 16, 2024, Denial of Reconsideration, at TSDR 14-16.

[58] *Id.* at 27-31; Aug. 29, 2023, Response to Office Action, at TSDR 120.

[59] Aug. 16, 2024, Denial of Reconsideration, at TSDR 32-33.

- Ye Ole Fashioned Ice Cream & Sandwich Café;[60]

- Yum Yum Shop;[61]

- The Sundae Drive Ice Cream Shop;[62]

- Dreamette;[63]

- Sweet Experience;[64]

- Dogg's Ice Cream;[65]

- Beachy Cream;[66]

- Ben & Jerry's (Hyannis);[67]

- Blue Mountain Beach Creamery & Shake Shop;[68]

- Nada Moo (nearly horizontal);[69] and

- Scoops Ahoy Ice Cream Parlor (horizontal).[70]

Several others use stripe patterns of various other alternating colors, many of equal width and proportion:

- Son's Ice Cream & Italian Ice (white, medium blue and dark blue stripes);[71]

---

[60]  *Id.* at 35-38.

[61]  *Id.* at 39-40.

[62]  *Id.* at 43-44.

[63]  *Id.* at 50-55.

[64]  *Id.* at 72-73.

[65]  *Id.* at 81-84.

[66]  Nov. 17, 2023, Subsequent Final Office Action, at TSDR 55-60.

[67]  *Id.* at 61-62.

[68]  *Id.* at 65-76.

[69]  *Id.* at 157-72.

[70]  *Id.* at 187-99.

[71]  Aug. 16, 2024, Denial of Reconsideration, at TSDR 57-59.

- Brooklyn Ice Cream Factory (grey & white on awning; blue & white on ice cream cone wrapper);[72]

- Handel's Ice Cream & Yogurt (blue & white with thin red stripe);[73]

- Portillo's (red & white);[74]

- Newport Creamery (green & white);[75]

- Penguin Ice Cream (red & white);[76]

- Purity Ice Cream Co. (red & white);[77]

- Dreyer's (brown, tan & white);[78]

- Joe's Italian Ice (red, white & green);[79]

- Junior's (orange & white) (slightly off-vertical);[80]

- Richie's (pink & white);[81]

- Jeni's (pink & white, off-vertical) (for Chocolate Peppermint flavor);[82]

- Klein's (green and red);[83]

---

[72] *Id.* at 63-65.

[73] *Id.* at 68-69.

[74] Nov. 17, 2023, Subsequent Final Office Action, at TSDR 12-13.

[75] *Id.* at 15-16.

[76] *Id.* at 18.

[77] *Id.* at 30-39.

[78] *Id.* at 79-85.

[79] Nov. 17, 2023, Subsequent Final Office Action, at TSDR 127-37.

[80] *Id.* at 139-51.

[81] *Id.* at 173-75.

[82] *Id.* at 241.

[83] *Id.* at 249-51.

- DiCosmo's (red, white & green);[84]

- Kulfi's (brown & white);[85] and

- Rita's (red & white).[86]

As with shakes, this evidence shows that blue & white stripes, and alternating color stripes generally, are a basic and common type of ornamentation used by many in connection with the sales of frozen confections, frozen drinks, and Italian ices. *See, e.g.*, *Chippendales*, 622 F.3d at 1351 (inquiries [1] & [2]); *Seabrook Foods*, 568 F.2d at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (first and third bulleted inquiries). Many other vendors of these products use vertical stripes of other alternating pairs of colors (or multiple colors). Applicant uses its ordinary and unremarkable stripes pattern in this customary way. At most, Applicant's blue & white stripes are simply a refinement or variation of the common practice of using alternating colored stripes in this field. *See, e.g.*, *Chippendales*, 622 F.3d at 1351 (inquiry [3]); *Seabrook Foods*, 568 F.2d at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (third bulleted inquiry). As to frozen confections, frozen drinks, and Italian ices, the evidence overwhelmingly shows that the proposed mark is not inherently distinctive.

### 3. Fruit drinks (Class 34)

We turn next to non-alcoholic fruit drinks, including smoothies and non-alcoholic lemonade. The record reflects five other companies using blue & white or other alternating-color stripes in connection with sales of fruit drinks:

---

[84] *Id.* at 253.

[85] May 30, 2023, Nonfinal Office Action, at TSDR 82-88.

[86] Aug. 29, 2023, Response to Office Action, at TSDR 119.

- LemonLemon (diagonal stripes of orange & white, violet & white, and yellow & white);[87]

- Portillo's (smoothies) (red & white);[88]

- Ben & Jerry's (Hyannis) (smoothies) (blue & white);[89]

- Blue Mountain Beach Creamery & Shake Shop ("Bill's lemonade") (two shades of blue, with white);[90] and

- Fauxmosa (diagonal stripes of white and yellow, white & gold, white & red, depending on flavor).[91]

As to fruit drinks, the evidence is not nearly as voluminous as with shakes, frozen confections, frozen drinks, and Italian ices. One vendor uses blue & white stripes, another uses a variation that alternates stripes of two shades of blue and white stripes. Three others alternate white stripes with another color besides blue. In assessing this quantum of evidence, we note that, in *Chippendales*, the Federal Circuit affirmed a finding that a cuffs & collars uniform for performer of adult live entertainment services was not inherently distinctive based on evidence that one other company in this industry (Playboy) used cuffs & collars as a part of their different costume. The Court rested its decision on the third *Seabrook* inquiry ("whether [it] is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods or services"). *See id.* at 1356. Specifically, the Court held

---

[87] March 2, 2021, Nonfinal Office Action, at TSDR 66-69.

[88] Nov. 17, 2023, Subsequent Final Office Action, at TSDR 12-13.

[89] *Id.* at 61-62.

[90] *Id.* at 65-76.

[91] *Id.* at TSDR 87-97.

that the *Seabrook* test would preclude a finding of inherent distinctiveness "if the Cuffs & Collar mark is a mere variant or refinement of a particular costume." 622 F.3d at 1356. The Court continued:

> The Board alternatively found the Cuffs & Collar mark not inherently distinctive because of the existence of the pervasive Playboy mark, which includes the cuffs and collar together with bunny ears. … The use of the Playboy mark constitutes substantial evidence supporting the Board's determination that Chippendales' Cuffs & Collar mark is not inherently distinctive. The Playboy bunny suit, including cuffs and a collar, was widely used for almost twenty years before Chippendales' first use of its Cuffs & Collar trade dress. The Cuffs & Collar mark is very similar to the Playboy bunny costume, although the Cuffs & Collar mark includes no bunny ears and includes a bare-chested man instead of a woman in a corset.

*Id.* at 1356-57.

Here, we have one fruit drink vendor (a Ben & Jerry's location) using blue & white vertical stripes, another using two shades of blue stripes with white stripes, and a few others using different-colored stripes. While there is no evidence of how long or extensively any of these others have used their striped ornamentation, there are more users than in *Chippendales.* Given that stripes generally are a rudimentary form of ornamentation and Applicant uses them in an unremarkable way (*Seabrook* inquiry [1] and part of *Fantasia* inquiry [3]), this use of stripes by a few others on the identified goods persuades us that the proposed mark is not inherently distinctive. In other words, in the context of fruit drinks, contrasting blue & white stripes, to use the words of the Supreme Court, "does not almost automatically tell a customer that it refers to a brand [or] … immediately signal a brand or a product source," *Wal-Mart*

*Stores*, 529 U.S. at 212 (cleaned up) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162-63 (1995))—the hallmark of an inherently-distinctive symbol or device.

### 4.   Alcoholic beverages, except beer; Hard seltzer (Class 33)

As to alcoholic beverages (except beer) and hard seltzer, the Examining Attorney placed in the record examples of companies that use repeating stripe patterns in connection with such goods. Two used blue & white stripes:

- Hartwall Original Long Drink (blue & thin white, red & thin white);[92] and

- Saint Spritz Amalfi (approximately equal width).[93]

Several others used variations of alternating-color vertical stripe patterns:

- Fishers Island Lemonade (white and yellow);[94]

- Smirnoff Peppermint Twist (diagonal red & white/red/grey);[95]

- Nylo (white with either blue, yellow, tan, or peach, depending on flavor);[96]

- Namitas (diagonal stripes of white with either yellow, pink, green, or light orange, depending on flavor);[97]

- Seagram's Italian Ice beverage (red & white; red, white & blue);[98] and

- Highball Hard Seltzer (different color horizontal stripes varying with flavor).[99]

---

[92]   Nov. 17, 2023, Subsequent Final Office Action, at TSDR 115-26.

[93]   *Id.* at 177-85.

[94]   *Id.* at 99-113.

[95]   *Id.* at 201-09.

[96]   *Id.* at 223-31.

[97]   *Id.* at 232-37.

[98]   May 30, 2023, Nonfinal Office Action, at TSDR 78-79.

[99]   Aug. 3, 2022, Final Office Action, at TSDR 33-35.

The evidence here is not as overwhelming as to shakes/milk shakes and frozen confections, but a little better in terms of quantity than as to non-alcoholic fruit drinks. Here, there are two vendors who have used blue & white vertical stripes, six other using variations (diagonal, other color with white). We think this evidence is enough to find that stripes are a basic and common type of ornamentation used in connection with the sales of alcoholic beverages (except beer), including hard seltzer. *See, e.g.*, *Chippendales*, 622 F.3d at 1351 (inquiries [1] & [2]); *Seabrook*, 568 F.2d at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (first and third bulleted inquiries). Many other vendors of these products use vertical (or diagonal) stripes of other alternating pairs of colors (or multiple colors). Thus, Applicant's blue & white stripes are simply an unremarkable refinement or variation of the common practice of using alternating-color stripes in this field. *See, e.g.*, *Chippendales*, 622 F.3d at 1351 (inquiry [3]); *Seabrook Foods*, 568 F.2d at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (third bulleted inquiry). Given how, in addition, stripes in general are a rudimentary form of ornamentation, we are persuaded that the proposed mark is not inherently distinctive as to the Class 33 goods.

### 5. Restaurant services; restaurant services featuring Italian ice, ice cream, and frozen drinks; serving food and drinks (Class 43)

The record contains plentiful evidence of restaurants, including restaurants featuring Italian ice and ice-cream products, using blue and white stripes as trade dress:

- Café Lucille;[100]

- Bridgehampton Candy Kitchen Ice Cream Parlour & Eatery;[101]

- Taggart's Ice Cream;[102]

- Ye Ole Fashioned Ice Cream & Sandwich Café;[103]

- Yum Yum Shop;[104]

- The Sundae Drive Ice Cream Shop;[105]

- Dreamette (wide blue stripes with narrow white stripes);[106]

- Sweet Experience;[107]

- Dogg's Ice Cream (blue and white of varying widths);[108]

- Beachy Cream;[109]

- Ben & Jerry's (Hyannis);[110]

- Blue Mountain Beach Creamery & Shake Shop;[111]

- The Maine Diner;[112]

---

[100] Aug. 16, 2024, Denial of Reconsideration, at TSDR 6-13.

[101] *Id.* at 14-16.

[102] *Id.* at 32-33.

[103] *Id.* at 35-38.

[104] *Id.* at 39-40.

[105] *Id.* at 43-44.

[106] *Id.* at 50-55.

[107] *Id.* at 72-73.

[108] *Id.* at 81-84.

[109] Nov. 17, 2023, Subsequent Final Office Action, at TSDR at 55-60.

[110] *Id.* at 61-62.

[111] *Id.* at 65-76.

[112] *Id.* at 153-55.

- Scoops Ahoy Ice Cream Parlor;[113]

- Café Cancale;[114]

- Yoshino;[115]

- Glorified Ham n Eggs;[116]

- White Castle;[117] and

- Inès.[118]

Several others who offer these services use variations of vertical (or variations that are not vertical) stripe patterns employing various other alternating colors:

- Son's Ice Cream & Italian Ice (white, medium blue and dark blue stripes);[119]

- Handel's Ice Cream & Yogurt (blue & white with thin red stripe);[120]

- Joe's Italian Ice (red, white & green);[121]

- Junior's (orange & white) (slightly off-vertical);[122]

- DiCosmo's (red, white & green);[123]

---

[113] *Id.* at 187-99.

[114] *Id.* at 256-64.

[115] *Id.* at 267-68.

[116] *Id.* at 269.

[117] *Id.* at 273.

[118] Mar. 2, 2021, Nonfinal Office Action, at TSDR 86.

[119] Aug. 16, 2024, Denial of Reconsideration, at TSDR 57-59.

[120] *Id.* at 68-69.

[121] Nov. 17, 2023, Subsequent Final Office Action, at TSDR 127-37.

[122] *Id.* at 139-51.

[123] *Id.* at 253.

- Friendly's (Pottstown, PA) (yellow & red);[124]

- Houlihan's (black, red & yellow);[125]

- Chipotle (dark grey & white);[126]

- Coldstone (black & white);[127]

- Johnny D's (blue & narrow yellow);[128]

- Kulfi's (brown & white);[129]

- Nifty Fifty's (Ridley Township location, black & white);[130]

- The Berkshire Café (green, white & red);[131]

- Café Duro (blue, white & brown);[132]

- Currywurst of Los Angeles (red & black);[133] and

- T.G.I. Friday's (Union Square, NYC location) (red & white).[134]

As with shakes/milk shakes and frozen confections, this evidence overwhelmingly shows that blue & white stripes, and alternating color stripes generally, are a basic and common type of ornamentation used in connection with restaurants generally

---

[124] *Id.* at 254-55.

[125] *Id.* at 270.

[126] *Id.* at 271.

[127] *Id.* at 272.

[128] May 30, 2023, Nonfinal Office Action, at TSDR 47-48.

[129] *Id.* at 82-88.

[130] Aug. 3, 2022, Final Office Action, at TSDR 8-14.

[131] *Id.* at 53-57.

[132] *Id.* at 66-67.

[133] Mar. 2, 2021, Nonfinal Office Action, at TSDR 80.

[134] *Id.* at 84.

and restaurants serving Italian ices and ice cream in particular. *See, e.g.,* *Chippendales*, 622 F.3d at 1351 (inquiries [1] & [2]); *Seabrook Foods*, 568 F.2d at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (first and third bulleted inquiries). Many other vendors of these products use vertical stripes of other alternating pairs of colors (or multiple colors). Thus, consumers would view Applicant's blue & white stripes as simply an unremarkable refinement or variation of the common practice of using alternating colored stripes in this field. *See, e.g., Chippendales*, 622 F.3d at 1351 (inquiry [3]); *Seabrook Foods*, 568 F.2d at 1344 (same), *Fantasia*, 2016 WL 5866950, at *3 (third bulleted inquiry). As to Applicant's restaurant services, the evidence overwhelmingly shows that the proposed mark is not inherently distinctive.

6. **Restaurant franchising, namely, offering business management assistance in the establishment and/or operation of restaurants; franchise services, namely, offering business management assistance in the establishment and operation of retail business establishments featuring Italian ice, ice cream, and frozen drinks (Class 35)**

As Applicant's description of services make clear, its franchising services are in the field of restaurants and "retail establishments featuring Italian ice, ice cream, and frozen drinks." The record reflects that another company, Uncle Louie G's, uses vertical blue & white stripes to promote its franchising services in the field of Italian ices and other frozen treats.[135] That a competing business uses the same stripes in much the same unremarkable way is relevant evidence that the proposed mark lacks

---

[135] *See* May 30, 2023, Nonfinal Office Action, at TSDR 35-43; Aug. 16, 2024, Denial of Reconsideration, at TSDR 27-31 (webpage using blue & white stripes and displaying a dropdown menu for "Franchise Opportunities" for Italian Ice and Ice Cream restaurant; "Learn about our franchise opportunities ….").

inherent distinctiveness. *See Chippendales*, 622 F.3d at 1356-57 (use of a similar uniform by one other competitor showed that the alleged trade dress was not inherently distinctive).

We further note that franchising in the food service field involves standards relating to a particular "ambiance and décor" as well as the type of food served. *See, e.g.*, *Nark, Inc. v. Noah's, Inc.*, No. 91052901, 1981 WL 40475, at *11 (TTAB 2011); *see also Williams v. I.B. Fischer Nev.*, 794 F. Supp. 1026, 1031 (D. Nev. 1992) (describing a typical fast-food franchise as an arrangement where, among other required uniformities, "the decor of each franchise is similar"), *aff'd*, 999 F.2d 445 (9th Cir. 1993); *see generally Two Pesos*, 505 U.S. at 764 & n.1 (describing the restaurant trade dress at issue as including the exterior of the restaurant and its décor). We therefore find that the overwhelming evidence, documented above, of use of alternating vertical stripes (particularly blue & white stripes) among restaurants and establishments selling ice cream and other frozen treats is relevant to determining whether such stripes would be viewed as nondistinctive trade dress in connection with franchising in the restaurant field.[136] We find that, as with non-franchised restaurant services, the proposed mark consisting of alternating blue &

---

[136] The Examining Attorney's brief does not break down the uses class-by-class, as we have done here, but rather breaks them down into two broader groups: the goods and the services. Applicant does not argue that the use of stripes by restaurants—including many serving Italian ices and other frozen confections—somehow should be walled off or otherwise is irrelevant to this determination.

white vertical stripes used "on a portion of the building facades in which the services are offered"[137] is not inherently distinctive.

### D. Summary as to inherent distinctiveness

In summary, the evidence shows, as to each of the classes of goods and services identified in the application, that consumers would perceive the proposed mark as mere ornamentation. We therefore affirm the refusal to register on the ground that the proposed mark is ornamental matter that is not inherently distinctive.

## III. Has the proposed mark acquired distinctiveness in connection with the goods and services in each identified International Class?

That the evidence shows that a proposed mark is not inherently distinctive as to the goods or services does not necessarily conclude the matter. It is well settled that even inherently nondistinctive trade dress can be registrable if an applicant claims and proves, under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), that the trade dress has acquired distinctiveness as a source identifier in the relevant field. *See, e.g.*, *Two Pesos*, 505 U.S. at 769 (marks that "do not inherently identify a particular source … may acquire the distinctiveness which will allow them to be protected under the Act."). Applicant made a Section 2(f) claim in this case, but the Examining Attorney rejected it as insufficient. We now turn to Applicant's claim, which it made in the alternative, that its proposed mark has acquired distinctiveness.

---

[137] *See* July 12, 2024, Voluntary Amendment, at TSDR 1.

## A. Legal standard for acquired distinctiveness

Acquired distinctiveness means that the "mark or dress has come through use to be uniquely associated with a specific source." *Id.* at 766 n.4 (cleaned up; citation omitted); *see also Textron, Inc. v. ITC*, 753 F.2d 1019, 1023 (Fed. Cir. 1985) (acquired distinctiveness is "an association in buyers' minds between the alleged mark and a single source of the product" or service).

Trademark Rule 2.41(a), 37 C.F.R. § 2.41(a), lists three non-exclusive ways that an applicant may attempt to prove acquired distinctiveness: (1) ownership of a prior registration of the same mark for similar goods and services; (2) a verified statement of substantially exclusive and continuous use of the mark in commerce for the preceding five years; and/or (3) other types of evidence, including "evidence showing duration, extent, and nature of the use in commerce and advertising expenditures."

Relevant to the third category in Rule 2.41(a), in *Converse, Inc. v. ITC*, 909 F.3d 1110, 1120 (Fed. Cir. 2018), the Federal Circuit undertook to list several types of evidence its prior decisions had identified as potentially relevant to a determination of whether a proposed mark has acquired distinctiveness. More recently, in *Heritage Alliance v. American Policy Roundtable*, 133 F.4th 1063 (Fed. Cir. 2025), the Federal Circuit restated these "factors" and elaborated on them as follows:

> Direct and circumstantial evidence may be considered, and we have approved analyzing the issue by considering six factors, without deeming all factors always relevant or the list exhaustive:

> (1) association of the trade dress with a particular source by actual purchasers (typically measured by consumer surveys);[138]
>
> (2) length, degree, and exclusivity of use;
>
> (3) amount and manner of advertising;
>
> (4) amount of sales and number of customers;
>
> (5) intentional copying; and
>
> (6) unsolicited media coverage of the product [or service] embodying the mark.

*Id.* at 1069-70 (Fed. Cir. 2025) (citing *Converse*, 909 F.3d at 1120 (listing the six factors)).

Before assessing Applicant's evidence, however, we first address Applicant's arguments about who shoulders the burden when an applicant makes a claim under Section 2(f) that a mark has acquired distinctiveness. Applicant contends that the "Examining [Attorney] has failed to meet the requisite burden to show that the Mark has not acquired distinctiveness."[139] This statement reflects an incorrect view of the law. "The applicant … bears the burden of proving acquired distinctiveness." *In re*

---

[138] Applicant did not offer a survey or any other direct evidence of consumer association of the stripes trade dress with Applicant. Survey evidence is a type of direct evidence of acquired distinctiveness, but "is not required." *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 424 (Fed. Cir. 2018). (We note that another type of direct evidence is consumer testimony, *see, e.g.*, *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 969 (Fed. Cir. 2015), but Applicant did not offer that type of evidence either.) In distinction from direct evidence, circumstantial evidence includes such things as evidence relating to advertising, sales, intentional copying, and unsolicited press, *see, e.g.*, *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 1201 (Fed. Cir. 1994); *Union Mfg. Co. v. ITC*, 826 F.2d 1071 (table), 1987 WL 37901, at *1 (Fed. Cir. 1987)—all of which are reflected in the other categories of evidence the Federal Circuit listed in *Heritage Alliance* and in *Converse*. These are the types of evidence that Applicant offers here.

[139] 11 TTABVUE 21; *see generally id.* at 19-22.

*La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015) (citing *In re Steelbuilding.com*, 415 F.3d 1293, 1297 (Fed. Cir. 2005)); *In re Hollywood Brands, Inc.*, 214 F.2d 139, 140 (CCPA 1954) ("There is no doubt that Congress intended that the burden of proof [under Section 2(f)] should rest upon the applicant for registration ....").

Citing *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 828 F.2d 1567 (Fed. Cir. 1987), Applicant relatedly argues that "[i]t is well-settled that any doubt as to whether a mark has acquired distinctiveness should be resolved in favor of Applicant."[140] We disagree. In *Merrill Lynch*, the Court noted that the Board decision on appeal "offered no conclusion on the adequacy of [the applicant's] showing under section 2(f)." 828 F.2d at 1571. Rather, the appeal concerned only the Board's decision that the mark was generic. *Id.*

As to evidence of acquired distinctiveness, we preliminarily note that "the exact kind and amount of evidence necessary to establish [acquired distinctiveness] necessarily depends on the circumstances of the particular case." *In re Hehr Mfg. Co.*, 279 F.2d 526, 528 (CCPA 1960)[141]; *see also, e.g.*, *In re Gen. Mills IP Holdings, LLC*, No. 86757390, 2017 WL 4082590, at *2 (TTAB 2017) ("The amount and character of evidence required to establish acquired distinctiveness depends on the facts of each case and the nature of the mark sought to be registered."). "Typically, more evidence

---

[140] *See* 11 TTABVUE 21.

[141] For proposed word marks, a similar principle applies. *See, e.g.*, *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 979 (Fed. Cir. 2018) ("[w]here a mark sits on a sliding scale of descriptiveness impacts the burden a proposed registrant must bear with respect to its claim of acquired distinctiveness.") (citation omitted).

is required where a mark is such that purchasers seeing the matter in relation to the offered goods [or services] would be less likely to believe that it indicates source in any one party." *Gen. Mills IP Holdings*, 2017 WL 4082590, at *2 (citations omitted) (the applicant bore a "difficult burden" in case involving the color yellow used as trade dress for cereal boxes); *see also In re Lorillard Licensing Co.*, No. 76680117, 2011 WL 3212246, at *5 (TTAB 2011) (packaging trade dress for cigarettes; "applicant has a heavy burden in this case to establish that the applied-for matter has acquired distinctiveness and is perceived as a trademark for its goods"); *In re Chevron Intell. Prop. Grp., LLC*, No. 78490836, 2010 WL 5010883, at *4 (TTAB 2010) (exterior trade dress fixture for vehicle service station services; "Because the subject matter sought to be registered is a mere refinement of the commonly used pole spanner design in the automobile service station industry, applicant has a relatively heavy burden for establishing acquired distinctiveness."); *In re Brouwerij Bosteels*, No. 77357895, 2010 WL 3501476, at *10 (TTAB 2010) (glass-and-stand container (i.e., product packaging trade dress) for goods identified as "beer"; "[G]iven the nature of the alleged mark, more evidence would be necessary to show that it has become distinctive of applicant's goods … .").

In this case, the evidence we discussed in our analysis of inherent distinctiveness shows that many others providing the goods and services covered by this application use stripes that are identical or highly similar to Applicant's in the same way that Applicant uses its stripes. Based on what the evidence shows to be the circumstances in this case—a case involving a commonly-used form of ornamentation—Applicant

has a relatively difficult task to prove that its proposed mark has acquired distinctiveness.

In assessing the evidence Applicant puts forward and other evidence in the record bearing on acquired distinctiveness, we also keep in mind that "[a]n evidentiary showing … adequate to show that a mark has acquired distinctiveness … includes evidence of the trademark owner's method of using the mark, supplemented by evidence of the **effectiveness** of such use to cause the purchasing public to identify the mark with the source of the product" or service. *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1125 (Fed. Cir. 1985) (emphasis added); *see also In re Palacio Del Rio, Inc.*, No. 88412764, 2023 WL 3751118, at *13 (TTAB 2023) ("The ultimate test in determining whether a designation has acquired distinctiveness is Applicant's success, rather than its efforts, in educating the public to associate the proposed mark[s] with a single source.") (citation omitted); *In re Pennzoil Prods. Co.*, No. 73670049, 1991 WL 326581, at *7 (TTAB 1991) ("applicant's large advertising expenditures are merely indicative of its efforts to develop secondary meaning, but are not determinative of the success of those efforts") (citation omitted).

## B.  Applicant's evidence of acquired distinctiveness

Preliminaries out of the way, we now assess the evidence bearing on acquired distinctiveness. Applicant did not attempt to show ownership of a prior registration under Trademark Rule 2.41(a)(1). When Applicant first claimed acquired distinctiveness in the alternative, it did not supply a verified statement of continuous and substantially exclusive use under subsection (a)(2). Later in prosecution, however, Applicant submitted the declaration of its Treasurer, Larry Silvestro,

attesting that Applicant "has been using" the stripe pattern "in connection with all the goods and services … for twenty years, since at least as early as 2004,"[142] and that such use has been "extensive" and "continuous."[143] Notably, however, this declaration does not track the language from Section 2(f) that Applicant's use has been "substantially exclusive"—which is not surprising given the pervasiveness of identical and similar stripe patterns in the fields covered by the application—so it fails to satisfy Trademark Rule 2.41(a)(2). Indeed, our review of the record reveals that Applicant never submitted an affidavit or declaration attesting to, "substantially exclusive" use of its proposed mark. *See* 15 U.S.C. § 1052(f) (referring to an applicant's right to submit "**proof** of substantially exclusive and continuous use") (emphasis added); *see also In re Nat'l Distillers & Chem. Corp.*, 297 F.2d 941, 944-45 (CCPA 1962) ("statements made over the signature of counsel are not evidence of the facts averred").[144] But we will consider Silvestro's Declaration for his other statements as part of our examination of the "other evidence" bearing on acquired distinctiveness under subsection (a)(3).

It is to subsection (a)(3)'s "other evidence" that we now turn. We will address the evidence using the category headings identified in *Heritage Alliance* and *Converse*, though not in the order they were listed in those cases.

---

[142] *See* May 17, 2024, Request for Reconsideration, at TSDR 18.

[143] *See id.* at 19.

[144] Even if Applicant had submitted such a declaration, Section 2(f) does not require the USPTO to accept it as definitive proof of acquired distinctiveness. *See, e.g., In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1336-37 (Fed. Cir. 2015) ("Although Section 2(f) … provides that that the PTO may accept five years of 'substantially exclusive and continuous' use as *prima facie* evidence of acquired distinctiveness, the statute does not require the PTO to do so.").

### 1. Unsolicited media coverage of the products or services embodying the mark

Applicant first argues that "[t]hird party news articles and publications illustrate that the Mark has acquired distinctiveness in the marketplace and consumers directly associate the Mark in connection with Applicant's Goods and Services."[145] An examination of the articles to which Applicant refers does not indicate any recognition of the stripes trade dress as identifying, uniquely or otherwise, Applicant. As far as we can discern, no article even mentions the stripes trade dress in text. And only a single 2019 article depicts Applicant's business with a photo showing only the stripes trade dress and no other visible source identifiers:



[146]

Several other articles display the claimed stripes trade dress only together with Applicant's word mark RALPH'S FAMOUS, *e.g.*:

---

[145] 11 TTABVUE 16-18 (citing Aug. 29, 2023 Response to Office Action Exhibit B).

[146] *See* Aug. 29, 2023, Response to Nonfinal Office Action, at TSDR 183.

 

 

 

---

147 *See id.* at 93.

148 *See id.* at 122.

149 *See id.* at 148.

150 *See id.* at 156.

151 *See id.* at 166.

152 *See id.* at 175.



[153].

What's more, some of the articles not only fail to mention the claimed stripes trade dress, they do not even depict it, *e.g.*:



154 155

---

153 *See id.* at 202.

154 *See id.* at 97.

155 *See id.* at 103.



Staten Island Advance

Customers gather to get a taste of the famous Ralph's treats in 2009.



156

157



158



159



160



161

---

[156] *See id.* at 111.

[157] *See id.* at 118.

[158] *See id.* at 137.

[159] *See id.* at 142.

[160] *See id.* at 169.

[161] *See id.* at 173.



[162]

Articles like these, referring to Applicant only by its word mark and discussing Applicant's business in positive terms, plainly benefit Applicant's business as a general matter. But in this appeal we are concerned with a different, more specific question: whether these articles reflect that customers and potential customers view blue & white stripes as uniquely indicating and distinguishing goods and services from a single source: Applicant. *See Two Pesos*, 505 U.S. at 766 n.4 ("uniquely associated with a specific source"); *Coca-Cola Co. v. Koke Co. of Am.*, 254 U.S. 143, 145-46 (1920) ("a single thing coming from a single source"); *Textron*, 753 F.2d at 1023 ("a single source of the product"); *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed. Cir. 1984) ("indicating one source of quality control and thus one quality standard"); *House of Worsted-Tex, Inc. v. Superba Cravats, Inc.*, 284 F.2d 528, 530 (CCPA 1960) ("a single manufacturer or vendor"). As to that specific question, in a marketplace brimming with others using the same or highly similar stripes trade dress for the same type of business, we think these articles do little to show us that

---

[162] *See id.* at 200.

consumers associate blue & white stripes as uniquely identifying Applicant. Certainly Applicant has not provided any evidence that these articles have had any such effect.

### 2. Amount of sales and number of customers

Applicant also argues that it has made "significant sales" under the mark and that "[i]n 2022 alone, Applicant sold approximately $8,564,482.35 worth of goods and services bearing or advertised under the Mark."[163] Applicant also points to redacted summaries of sales revenues from 2017-2021, which range annually from $6.5M to $8.1M in revenue.[164] The declaration from Applicant's Treasurer avers that from 2004-2024, Applicant enjoyed "more than $110 Million in sales" revenues and that since 2004, Applicant has "served more than one million customers."[165]

Sales figures alone may not suffice in showing that a particular proposed mark has acquired distinctiveness where other marks were featured with the mark at issue or the growth could be attributed to the product's popularity. *E.g.*, *In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 1318 (Fed. Cir. 1990) ("The Board likewise ruled correctly that appellant's evidence as to acquired distinctiveness or secondary meaning was insufficient to permit registration under Section 1052(f). Growth in sales was the principal factor upon which appellant relied to show distinctiveness. But, as the Board observed, this may indicate the popularity of the product itself rather than recognition of the mark 'BABY BRIE' as indicative of origin; or it may indicate

---

[163]  11 TTABVUE 18. The figures cited in this section were not submitted confidentially.

[164]  *See* Aug. 29, 2023, Response to Office Action, at TSDR 205-30.

[165]  *See* May 17, 2024, Request for Reconsideration, at TSDR 18-19.

acceptance of Bongrain's other mark 'Alouette', which was used along with 'BABY BRIE' on the packages."); *Seabrook*, 568 F.2d at 1345 ("The only evidence presented by Seabrook on secondary meaning is the sales volume of its products. Although such evidence may have relevance in establishing secondary meaning, it is not necessarily indicative of recognition of the mark by purchasers as an indication of source of the goods. There is no persuasive evidence that **the design portion** of Seabrook's mark has acquired secondary meaning, such as might be shown by a consumer survey or by advertising emphasizing the design portion of the mark to potential customers coupled with a showing that such advertising had consumer impact. All sales were made under the composite words-plus-design mark.") (citations omitted; emphasis added).

One way to help sales figures and customer numbers have more "oomph" in showing acquired distinctiveness is to provide contextual evidence showing how an applicant's numbers stack up compared to those of its competitors. We have frequently noted that contextual evidence affects the probative value of an applicant's sales and advertising figures. *See, e.g.*, *In re GJ & AM, LLC*, No. 86858003, 2021 WL 2374670, at *21 (TTAB 2021) (listing cases); *accord In re JC Hospitality LLC*, 802 F. App'x 579, 585 (Fed. Cir. 2020). Applicant here, however, points to no such contextual evidence.

The sales figures and customer numbers here are not so large on their face that, in the absence of contextual information, we would give them much weight in determining whether consumers have come to recognize the blue & white vertical

stripe pattern as indicating a unique source of the identified goods and services. And the fact that, as far as we can tell, the stripes trade dress always appears with Applicant's main word mark(s) lessens the probative value of these raw summary figures even more. Moreover, these numbers lump all of Applicant's goods and services together, making it impossible to determine how we should apply them to each of the goods and services as to which Applicant claims that the mark has acquired distinctiveness. And, as we mentioned earlier, we are required to assess both inherent and acquired distinctiveness as to each type of good or service identified. *See* 15 U.S.C. § 1052(f) ("nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive **of the applicant's goods**") (emphasis added); *Automatic Radio Mfg.*, 404 F.2d at 1396 (distinctiveness must be determined "with respect to the involved goods … whether the issue be considered to be descriptiveness or 'secondary' meaning").

These generalized and uncontextualized sales figures do little to advance Applicant's argument that consumers uniquely associate the stripes with Applicant.

### 3. Amount and manner of advertising

Applicant argues that it has spent "tens of thousands of dollars on marketing and advertising under the Mark," noting that it spent "approximately $14,400.00 advertising Applicant's Goods and Services bearing the Mark" in 2022.[166] Its Treasurer's declaration avers that, from 2004 to 2024, Applicant "spent over approximately $2 million dollars in advertising expenditures educating consumers

---

[166] *See* 11 TTABVUE 18.

about the connection of the Ralph's Goods and Service's (sic) in connection with the [stripes trade dress]."[167]

There are several deficiencies in this evidence. First, just on their faces, these are not large numbers. Second, the declaration points us to no exemplars of advertisements purchased with these expenditures, leaving us to guess how these ads "educat[ed] consumers" about the stripes trade dress. The only attachments to the declaration that could fall under the rubric of advertising are (1) webpages from Applicant's website entitled "Our Story," providing a timeline of Applicant's history;[168] and (2) two Instagram posts and one Facebook post[169] each depicting a storefront of one of Applicant's locations, all of which display Applicant's word mark prominently above the entrance and none of which mention the stripes trade dress.[170]

---

[167] *See* May 17, 2024, Request for Reconsideration, at TSDR 19.

[168] *See id.* at 21-30.

[169] We note that the Silvestro Declaration attested to "more than 40,000 collective followers on various [social media] platforms," *see id.* at 19, but Applicant's brief does not mention this, let alone explain its significance. Nor do we see any context as to whether that's a lot or a little in the various fields covered by the application (among which Applicant does not differentiate). As an absolute matter, the number seems small on its face for collective followers across multiple social media platforms.

[170] *See id.* at 46-48. Though Applicant's brief does not point to it, we also note that Applicant's August 29, 2023, Response to Nonfinal Office Action discussed advertising, *see id.* at 22, but it attached only a few invoices for advertising charged to franchisees, with no exemplars of what the advertising looked like. *See id.* at 232-77. We further note that Applicant submitted several screenshots of social media as exhibits to its February 3, 2023, Request for Reconsideration, at TSDR 136-64, and August 29, 2023, Response to Nonfinal Office Action, at TSDR 53-80. But our review of these pages revealed, among hundreds of photos, almost no depictions of the stripe pattern. Instead, the logo version of the RAPLH'S FAMOUS mark featured prominently throughout. In addition, the social media hashtags for these posts all incorporate variations of Applicant's word marks (e.g., #ralphsices, #ralphsfamous, #ralphsfamousices, #ralphsfamousitalianices, #ralphsicecream). Thus, the social media evidence presented does nothing to advance Applicant's argument that the proposed mark has acquired distinctiveness. *See In re Jasmin Larian, LLC*, No. 87522459, 2022 WL 374410,

Thus, for all we can discern from the record, Applicant's advertising argument suffers from the same probative-value-sapping problem as its sales argument does: it seems more likely that consumers seeing these few exemplars of social media posts and the webpages are more likely to view Applicant's word mark(s) as identifying source than the sometimes-appearing-and-sometimes-not stripes pattern. In *In re Mogen David Wine Corp.*, 372 F.2d 539 (CCPA 1967), the Court observed:

> We have examined appellant's advertising and promotional material appearing of record. We find therein no promotion advertisement or display of the container configuration per se as an indication of the origin of the wines. While a decanter bottle of wine is featured, there is nothing to indicate that the container has been promoted separate and apart from the word mark "MOGEN DAVID." We are unable to find a single reference to the container itself. Prominently displayed on the wine-filled container in every instance is "MOGEN DAVID WINE." … We think it reasonable to assume, therefore, as did the board, that the … association of the decanter with appellant [as reflected in 50 form affidavits] was predicated upon the impression imparted by the mark MOGEN DAVID and other descriptive material appearing thereon rather than by any distinctive characteristic of the container per se.

*Id.* at 541-42; *see also, e.g.*, *Soccer Sport Supply*, 507 F.2d at 1403 (advertising displaying the design at issue along with word marks lacked the "nexus" that would tie together use of the design and the public's perception of the design as an indicator of source); *In re McIlhenny Co.*, 278 F.2d 953, 956-57 (CCPA 1960) (promotion of a bottle design bearing other trademarks is insufficient under Section 2(f) to show that the public views the bottle design alone as a trademark).

---

at *18 (TTAB 2022) (social media hashtags of Applicant's business name undercut argument that the trade dress of the handbag itself had acquired distinctiveness as a source identifier).

Finally, there's no way to identify the goods and/or services to which the advertising pertained.

Applicant's brief also insists that Applicant engaged in "look for" advertising.[171] It provides four purported examples from the record in its brief to support the argument:



These photos, which simply depict the proposed mark along with Applicant's word marks, do not constitute "look for" advertising. "'Look for' advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source. It does not refer to advertising that simply includes a picture of the product or touts a feature in a non source-identifying manner." *In re SnoWizard, Inc.*, No. 87134847, 2018 WL 6923620, at *6 (TTAB 2018) (citation omitted); *see also Textron, Inc.*, 753 F.2d at 1027 ("Although

---

[171] *See* 11 TTABVUE 11-12.

Textron has pictured the silhouette of the Bridgeport machine in its operator's manuals and certain promotional activities, it has not proffered evidence showing that these promotions focused buyers' attentions on the shape of the machine or that the design of the column and ram was featured in any way."); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:30 (5th ed. Dec. 2025 update) ("to qualify as evidence supporting acquired distinctiveness (secondary meaning), the 'look for' advertising must promote the specific product shape [or "nonword design"] at issue and not just draw attention to the goods in general") (footnote and internal quotation marks omitted).[172] We have scoured the record and have seen no evidence that Applicant has engaged in any "look for" advertising.

---

[172] For examples of effective "look for" advertising, see *Owens-Corning*, 774 F.2d at 1125-27 (record reflected effective "look for" advertising of pink color as mark for home insulation where extensive advertising featured Pink Panther cartoon character promoting pink insulation, using slogans "Add another layer of pink to your house," "Put your house in the pink," visuals showing igloos encased in pink, a "February Pink Sale" promotion, ads using pink in slogans: Pink of Perfection; The Pink Cooler; Big Pink; Love that Pink; Pink Power; America's Favorite Pink Product; Tickled Pink; Put your House in the Pink; Up with Pink; Prime Time Pink; Think Pink; Think More Pink; Beat the Cold with Pink; All that Pink; and Plant Some Pink Insulation in your Attic); *In re Data Packaging Corp.*, 453 F.2d 1300, 1304 (CCPA 1972) (mark was a circular ring of contrasting color positioned around hub of a reel of computer tape and "each advertisement contains such statements as 'A ring of color around the hub of the reel identifies it as a quality reel with an aluminum winding surface from DATA PACKAGING CORPORATION,' and 'Recognize [appellant's computer tape reels] by the color-coded Saturn ring around the hub.'") (cleaned up); *In re Hehr Mfg. Co.*, 279 F.2d 526, 527-28 (CCPA 1960) (red rectangular sticker on which the applicant's other marks were placed was recognized by itself as a source indicator where record contained evidence of advertising containing "slogans stressing the Red Square as an identifying trademark" such as "phrases such as 'Always look for the Red Sticker,' 'Look for these red stickers, they are your guide to quality,' 'These red stickers are your assurance of quality,' and the like."); *In re Swift & Co.*, 223 F.2d 950, 953 (CCPA 1955) (although polka dots are a common form of ornamentation, court noted that the evidence showed that "the labels carrying the polka-dot design contain the phrase 'Pick the Polka Dot Package;' [and] that this phrase has been used extensively in advertising [the] product").

We find that Applicant's advertising-related evidence does very little to advance its Section 2(f) claim.

### 4. Intentional copying and length, degree, and exclusivity of use

Two other types of evidence or "factors" considered relevant to acquired distinctiveness are "intentional copying" and "length, degree, and exclusivity of use." *See Heritage All.*, 133 F.4th at 1069-70; *Converse*, 909 F.3d at 1120. As this case is presented to us, the two categories weave together. Despite submitting a declaration saying nothing about whether its use was substantially exclusive, Applicant's brief argues that its "use has been substantially exclusive … ."[173] As discussed above, however, there is extensive evidence that Applicant's use of the proposed trade dress is not substantially exclusive because others in the relevant fields use blue & white stripes very similar[174]—and some identical—to Applicant's blue & white stripes trade dress. Applicant tries to minimize or deflect this evidence by arguing that this third-party use reflects intentional copying and that "such copying proves that Applicant's Mark has acquired distinctiveness."[175]

---

[173] *See* 11 TTABVUE 15. "Attorney argument is not evidence." *Icon Health and Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) (citation omitted); *see also In re Simulations Publ'ns, Inc.*, 521 F.2d 797, 798 (CCPA 1975) ("Statements in a brief cannot take the place of evidence.") (citation omitted).

[174] When a word mark is highly descriptive, "the third-party uses do not have to be identical" to undercut an assertion of substantially exclusive use and acquired distinctiveness. *Saint-Gobain Corp v. 3M Co.*, No. 91119166, 2007 WL 2509515, at *20 (TTAB 2007) (citation omitted). The same principle applies to trade dress that is "a mere refinement of a common, basic design." *Goodyear Tire and Rubber Co. v. Interco Tire Corp.*, No. 91096404, 1998 WL 998958, at *16 (TTAB 1998); *accord Kohler Co. v. Honda Giken Kogyo K.K.*, No. 91200146, 2017 WL 6547628, at *41 (TTAB 2017).

[175] *See id.* at 20.

Multiple examples of third-party use of the proposed trade dress is a serious problem for Applicant's Section 2(f) claim because, under the statutory definition of a trademark, the purported trademark must "satisfy[ ] the most important part of the statutory definition of a trademark," which is both to "identify **and distinguish**" source. *Qualitex*, 514 U.S. at 162 (emphasis added) (quoting 15 U.S.C. § 1127); *see also Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023) ("a trademark is not a trademark unless it identifies a product's source (this is a Nike) **and distinguishes that source from others** (not any other sneaker brand)") (emphasis added; citation omitted); *USPTO v. Booking.com BV*, 591 U.S. 549, 552 (2020) ("A trademark distinguishes one producer's goods or services from another's."); *id.* at 553 ("Prime among the conditions for registration, the mark must be one 'by which the goods of the applicant may be distinguished from the goods of others.'") (citing 15 U.S.C. § 1052); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985) (trademarks allow consumers "to distinguish among competing producers"). "When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances." *Levi Strauss*, 742 F.2d at 1403; *see also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1290 n.5 (Fed. Cir. 2010) (affirming finding of lack of acquired distinctiveness of the color blue as applied to endoscopic tubes where "at least one of ERBE's competitors uses blue flexible endoscopic probes—and thus the requisite secondary meaning is

missing here"). In other words, use of the same proposed mark by others undercuts an Applicant's ability to show its use, however long, was "substantially exclusive," as required by Section 2(f).[176] *See also Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, No. 91211014, 2016 WL 4474509, at *13 (TTAB 2016) ("[T]he widespread use of the surname Ayoub by unaffiliated rug, carpet and flooring businesses is inconsistent with Applicant's claim of acquired distinctiveness of AYOUB. Indeed, the proliferation of such uses clearly shows that Applicant's use is not 'substantially exclusive.'") (citation omitted).

As our discussion above laid out in detail, there is voluminous evidence in the record of other restaurants, ice cream and Italian ice parlors, and producers of packaged ice cream, frozen confections, and various beverages who use or have used blue & white vertical stripes in connection with these goods and services. Applicant tries to minimize this evidence by labelling these uses as infringements of Applicant's trademark rights.[177] It is true that infringing or otherwise inconsequential uses do not count against an applicant seeking to prove acquired distinctiveness. *See, e.g.*, *Galperti*, 17 F.4th at 1147; *L.D. Kichler Co. v. Davoil Inc.*, 192 F.3d 1349, 1352 (Fed.

---

[176] It does not matter whether the third parties use the trade dress as a source identifier or in a non-source-identifying way, like descriptively or ornamentally. *See, e.g., Galperti, Inc. v. Galperti S.R.L.*, 17 F.4th 1144, 1148 (Fed. Cir. 2021) ("a significant amount of marketplace use of a term not as a source identifier for those users does tend to undermine an applicant's assertion that its own use has been substantially exclusive"); *see also Gen. Mills IP Holdings*, 2017 WL 4082590, at *7 ("[C]ustomers accustomed to seeing numerous brands from different sources offered in yellow packaging are unlikely to be conditioned to perceive yellow packaging as an indicator of a unique source. Rather, they are more likely to view yellow packaging simply as eye-catching ornamentation customarily used for the packaging of breakfast cereals generally.") (punctuation altered).

[177] *See* 11 TTABVUE 20-22.

Cir. 1999); *Ayoub*, 2016 WL 4474509, at *13. On the other hand, it's not enough for an applicant simply to label all others' use of the device as "infringing" or "inconsequential." "Elimination of 'infringements' is a matter for the courts, not the PTO, and the mere assertion that all other users are infringers cannot substitute for the required showing of specific facts in support of a potential finding that [the alleged mark] has acquired distinctiveness as an indication of a single source or quality standard for shoes." *Levi Strauss*, 742 F.2d at 1403 & n.1.

Applicant has provided no evidence that it ever even tried to enforce its alleged rights in the stripes trade dress against anybody, let alone evidence of a court judgment that any of the many third parties using the same (or similar) stripes are infringers. *Cf. Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 364 (S.D.N.Y. 2003) ("Malaco's failure to police its trade dress for decades is further evidence that the Swedish Fish trade dress is weak and has not acquired distinctiveness.") (citations omitted). Nor has Applicant provided any evidence that any of the third-party use of the same or similar stripes was undertaken to benefit from any goodwill associated with Applicant's stripes trade dress—as opposed to a desire to use a common, visually pleasing form of ornamentation—or even that they know of Applicant at all. Infringement is use in a way that seeks to profit from the senior user's goodwill. *See, e.g.*, *Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*, No. 91161403, 2009 WL 1017284, at *26 (TTAB 2009) ("copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse

consumers and pass off his product as the plaintiff's") (cleaned up; citation omitted).[178]

We therefore reject Applicant's dismissal of these multiple instances of third-party use, and we also reject Applicant's contention that "extensive copying"[179] supports its claim of acquired distinctiveness. In short, the multiple examples of others in Applicant's fields using the same or similar stripes in the same ornamenting fashion present a seemingly insurmountable hurdle to Applicant's Section 2(f) claim, irrespective of any "efforts" to establish acquired distinctiveness in its proposed trade dress. *See, e.g., Levi Strauss*, 742 F.2d at 1403; *Gen. Mills IP Holdings*, 2017 WL 4082590, at \*6 ("non-exclusive use presents a serious problem for the merchant seeking to develop trademark rights in a word, symbol, or device that is not inherently distinctive, because it interferes with public perception that it serves as an indicator of a single source") (citing *Owens-Corning*, 774 F.2d at 1127 ("A color which is employed by others in the industry acts not as an indicator of source but as mere ornamentation.")).

### 5. Collective assessment of Applicant's Section 2(f) evidence

As we mentioned above, proving a claim of acquired distinctiveness under Section 2(f) requires not only evidence of an applicant's "substantially exclusive and

---

[178] Though Applicant does not elaborate on why it believes some of these uses by others of the same or similar stripe trade dress are "inconsequential," we note the evidence in this case exposes an unexplained inherent contradiction in that argument: how is it that, when others use stripes in a manner identical or similar to Applicant, their uses are inconsequential, but Applicant's use results in the establishment of trademark rights?

[179] *See* 11 TTABVUE 19-20.

continuous use" of the mark in sales and advertising—i.e., its "efforts in educating the public to associate the proposed mark with a single source," *Palacio Del Rio*, 2023 WL 3751118, at *13 (punctuation altered)—but also the "effectiveness" or "success" of those efforts, *see id.*; *Owens-Corning*, 774 F.2d at 1125. Here, the magnitude of Applicant's advertising efforts do not appear to have been substantial. In addition, the evidence of Applicant's "efforts" (advertising and social media) discloses no direct attempt to educate consumers that the stripes trade dress indicates a unique source for the relevant goods and services, nor does it reveal or even suggest any indirect or subliminal efforts towards that goal. Moreover, there is no evidence whatsoever as to the effectiveness or success of Applicant's alleged efforts to create the required unique association.

But even if Applicant had made concerted efforts to educate consumers to regard the stripe pattern as uniquely indicating Applicant's goods and services, the plethora of third-party uses of blue & white or similar stripes in connection with the same goods and services presents a nearly insurmountable hurdle for any such effort to succeed because they show that such use has not been "substantially exclusive." *See, e.g.*, *Levi Strauss*, 742 F.2d at 1403; *Ayoub*, 2016 WL 4474509, at *13. We find that Applicant has not come anywhere close to proving its alternative claim that the proposed trade dress has acquired distinctiveness.

**Decision**: We deem Applicant's May 17, 2024, substitute specimen acceptable and therefore reverse the refusal under Sections 1 and 45 as to Applicant's Class 35 services. We accept, for purposes of this appeal, Applicant's October 11, 2024,

proposed amendment to the description of the proposed mark. But we affirm the refusal to register the proposed mark under Sections 1, 2, 3 and 45 as applied to the goods and services in International Classes 29, 30, 32, 33, 35, and 43 (i.e., all identified classes) because the proposed mark is not inherently distinctive and Applicant failed to prove its claim, in the alternative, that the proposed mark has acquired distinctiveness under Section 2(f).